IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DELORA LANNING, | CASE NO. 5:20-CV-01676-JRK |
| Plaintiff, | JUDGE JAMES R. KNEPP, II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Delora Lanning ("Ms. Lanning") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB") and supplemental security income ("SSI"). (ECF #1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to a magistrate judge for preparation of a report and recommendation pursuant to Local Rule 72.2, and reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 25, 2021). Following review, and for the reasons stated below, I recommend the Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Lanning filed for DIB on October 24, 2017 and for SSI on November 13, 2017, alleging a disability onset date of March 10, 2017. (Tr. 111, 126). Her date last insured is on December 31, 2021. (Tr. 110, 125). Her claims were denied initially and on reconsideration. (Tr.

110-73). She then requested a hearing before an administrative law judge. (Tr. 217-18). Ms.

Lanning and a vocational expert ("VE") each testified at a hearing before the ALJ on June 14,

2019. (Tr. 54-94).

On August 16, 2019, the ALJ found Ms. Lanning not disabled in a written decision. (Tr.

27-50). The Appeals Council denied Ms. Lanning's request for review, making the hearing

decision the final decision of the Commissioner. (Tr. 1-4; *see* 20 C.F.R. §§ 404.955, 404.981). Ms.

Lanning timely filed this action on July 29, 2020. (ECF #1).

FACTUAL BACKGROUND

**I.    ADMINISTRATIVE HEARING**

Ms. Lanning was represented by counsel at the June 14, 2019 hearing. (Tr. 54). The VE

was also present for the hearing. (Tr. 55). Ms. Lanning initially appeared at the hearing out of

breath, but was able to catch her breath and testify after her attorney's opening statement. (Tr. 56-

58). Ms. Lanning's main complaints were back issues and related pain, chronic obstructive

pulmonary disease (COPD), gastritis, depression, and anxiety. (Tr. 59-60).

Ms. Lanning testified she completed the eleventh grade and held a commercial driver's

license. (Tr. 62). She drove a truck and was compensated on a loads-per-week basis. (Tr. 65-66). She

had an extensive work history in food service, and had worked full-time as a cook, although her

most recent work did not qualify as substantial gainful activity ("SGA"). (Tr. 62-63). She had

worked full-time for a number of years at the Golden Corral as a cook and as a manager. (Tr. 63-

65). At the time of the hearing, Ms. Lanning was working as a prep cook at a family restaurant,

working one- to two-hour shifts, for a total of eight to sixteen hours biweekly. (Tr. 85-86).

Ms. Lanning testified that the pain in her back, neck, and hips prevented her from working. (Tr. 67, 74). She also testified to having chronic fibromyalgia. (Tr. 74). Ms. Lanning testified she was experiencing "very bad" pain, "past a ten" during the hearing. (Tr. 70, 72-73). Periodically during the hearing, Ms. Lanning needed to stand and move about the room to manage her pain. (Tr. 71). Ms. Lanning had used a pain pump to control her back pain, but ultimately it was removed due to infection and inconsistent dosing. (Tr. 68-70). She was on oral pain medication at the time of the hearing. (Tr. 71-72). The pain medication makes Ms. Lanning feel drowsy, nauseated, and affects her memory. (Tr. 84). Ms. Lanning testified she can only sit for 15-20 minutes at a time, and then must stand or walk to relieve the pressure from her lower back. (Tr. 73). She does not require a cane or walker for assistance. (*Id.*). Even though moving about can help the pain, Ms. Lanning testified she is limited in what she can do, due to her back and breathing issues. (Tr. 75).

In addition to her back issues, Ms. Lanning stated she experiences trouble breathing due to her COPD and has intermittent panic attacks, which worsen her breathing issues. (*Id.*). Ms. Lanning testified she experiences panic attacks when she is around crowds of seven or more people. (Tr. 81-82). She has two inhalers, a nebulizer, and is on nighttime oxygen. (Tr. 75). Although Ms. Lanning had been a 1.5 to 2 packs-a-day smoker, she quit smoking nine days before the hearing. (Tr. 76-78).

Ms. Lanning had breast cancer and a double mastectomy. (Tr. 78). Although she attempted reconstruction surgery, the implants were removed due to recurring infection. (*Id.*). She had four surgeries total, but did not need chemotherapy or radiation. (Tr. 78-79). Ms. Lanning has not had

a recurrence of breast cancer and attends doctor visits only every six months for monitoring. (Tr. 79).

The VE then testified. According to the VE, Ms. Lanning's most recent past work was classified as Cook, with an SVP of 6 and a medium exertional level. (Tr. 88). Her past job did not carry any transferable skills. (*Id*.). The ALJ posed the following hypothetical to the VE: a hypothetical individual who is limited to occasional climbing of ramps and stairs, but who would never climb ladders, ropes, or scaffolds; would be limited to occasional balancing, stooping, kneeling, crouching, or crawling; would never be exposed to unprotected heights, moving mechanical parts, or commercial driving, and would avoid concentrated exposure to humidity, dust, odors, fumes, or other pulmonary irritants or to extreme cold or heat; the individual would be limited to performing simple, routine tasks and simple work-related decisions, and would be limited to frequent interactions with supervisors, coworkers, or the general public, and could tolerate few changes in the routine work setting. (Tr. 89). In addition to these limitations, the ALJ also stated the individual would be limited to sedentary work—only two hours of standing and walking—and would require the ability to alternate between sitting and standing every 30 minutes. (Tr. 90). According to the VE, the available jobs in the national economy for this individual would be Weight Tester, Order Clerk, and Addresser. (Tr. 89-90). The VE accounted for the sit/stand option based on the VE's work experience and training, because the *Dictionary of Occupational Titles* does not account for sit/stand options. (*Id*.).

The ALJ also asked the VE whether an individual who would be off-task 20 percent of the time, absent three times per month, and require the ability to elevate her legs to waist level 20 percent of the time would have work in the national economy. (Tr. 90-91). The VE was also asked

4

for testimony on the impact if the individual was restricted to using hands to handle, finger, or feel 50 percent of the workday. (Tr. 91-92). Again, based on the VE's work experience and training, the VE testified each of those accommodations would prevent the individual from working. (Tr. 90-92). The VE testified that employers will tolerate up to ten percent off-task and no more than two days per month absent—including days in late or leaving early. (Tr. 91).

## II.   PERSONAL AND VOCATIONAL EVIDENCE

Ms. Lanning was born on March 31, 1975, and was 41 years old on the alleged onset date of her disability; she was therefore defined as a younger individual age 18-49 (Tr. 42; *see also* 20 C.F.R. §§ 404.1563 and 416.963). Ms. Lanning had past relevant work as a cook that rose to the level of "substantial gainful activity" under the Act. (Tr. 42; *see also* 20 C.F.R. §§ 404.1565 and 416.965). Given her residual functional capacity, the ALJ found Ms. Lanning could not perform her past relevant work, but could make a successful adjustment to other work. (Tr. 42).

## III.   RELEVANT MEDICAL EVIDENCE[1]

**Back Pain Management.**[2] Ms. Lanning receives pain management treatment for her post-laminectomy syndrome, spondylosis, radiculopathy, chronic pain syndrome, sacroiliitis, and

---

[1]      The Commissioner's brief asserts that evidence prior to Ms. Lanning's alleged June 30, 2017 onset date is not relevant. (Pl.'s Reply Br., ECF #19, PageID 1801; Def.'s Br., ECF #18, PageID 1788). Ms. Lanning seeks benefits due to chronic conditions that have developed and worsened over time. (Pl.'s Reply Br., ECF #19, PageID 1772). Medical records prior to the alleged onset date are relevant to creating a longitudinal picture of Ms. Lanning's conditions and are therefore included in this summary of relevant medical evidence. *See* SSR 18-1. Ms. Lanning, however, does not raise any issues as to ALJ's treatment of Ms. Lanning's mitral valve disorder or the opinion of that treating physician in her opening brief. Any issue not raised in an opening brief is deemed waived. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). Consequently, I have not summarized those records here.

[2]      Ms. Lanning has extensive medical records from frequent visits to her clinicians for pain management; at times, her visits were every two weeks. Upon review, these records present consistent findings—complaints of an "electrical-like" pain, positive straight leg raise tests, positive

cervicalgia, which causes chronic hip, back, neck, leg, and foot pain. (*See* Tr. 433-639, 1038-1163, 1317-1407, 1510-47, 1643-57). She receives treatment from multiple practitioners at ADO Health Services/Doctors Pain Clinic, including Steven Humansky, PA-C; Jafri M. Syed, M D.; Tracy Neuendorf, D.O.; Robin Small, APRN, CNP; Jason Sindledecker, NP-C; April Story Cornelius, NP-C; Briana Sanford, NP-C; Barbara Hawkins, NP-C; and Barbara Walsh, NP-C. (*See id.*).

On December 12, 2016, Ms. Lanning had a Medtronic subarachnoid pain pump installed to treat her post-lumbar laminectomy syndrome, severe neuropathic pain in her back and legs, and her chronic pain syndrome. (Tr. 1238-91). Ms. Lanning was in stable condition after the surgery, with good results and no complications. (Tr. 1240).

Ms. Lanning had regular appointments at the pain clinic and frequently requested an increase in dosage of her pain medication, either oral medication or via pump. (*See, e.g.*, Tr. 433, 438, 445, 455, 460, 465, 480, 1041, 1044, 1054). Notes from these visits consistently describe an "electrical-like" pain down her legs that felt like an "explosion" when standing or sitting for long periods. (*See id.*; *see also, generally*, Tr. 433-639, 1038-1163, 1317-1407, 1510-47, 1643-57).  Ms. Lanning often reported that nothing relieved her pain, though it was lessened when laying down or with rest. (*Id.*). At these visits, Ms. Lanning most frequently stated her pain was controlled, her quality of life was improved with the current pain management regimen, and she was able to continue with her daily functions. (*See, e g.*, Tr. 445, 455, 460, 465, 480, 1041, 1051, 1321, 1325, 1329, 1653). She stated that the pain treatment regimen had the appropriate analgesic effect. (Tr.

---

tenderness tests in the back and hips, referrals and recommendations for physical and aquatic therapy, Ms. Lanning's requests for an increase in medication, and clinicians adjusting pain medication prescriptions accordingly. (*See, e.g.*, Tr. 433-639, 1038-1163, 1317-1407, 1510-47, 1643-57). The results from Ms. Lanning's frequent pain clinic visits are thus provided here in digest form.

463). However, some later visits in 2019 showed that her pain was not always well-controlled. (Tr. 1643, 1648; *cf.* Tr. 1653).

Various functional tests were performed at these appointments. Ms. Lanning often showed positive FABER (flexion, abduction, and external rotation) tests bilaterally, although at times would present on either the left or the right. (*See* Tr. 440, 447, 482, 487, 492, 497, 502, 511, 594, 609, 619, 630, 634, 1043, 1048, 1053, 1331, 1338). Lumbar and cervical facet load tests were often positive. (*See* Tr. 435, 440, 447, 457, 472, 482, 487, 492, 497, 502, 521, 525, 530, 539, 553, 558, 564, 569, 574, 579, 594, 599, 604, 609, 619, 625, 630, 634, 1043, 1048, 1053, 1145, 1319, 1331, 1342, 1353, 1358, 1362, 1378, 1383, 1388, 1645, 1650). Physical examinations throughout the treatment period noted tenderness in the midline, bilateral paraspinal muscles, and bilateral sacroiliac joints. (*See generally* Tr. 435, 440, 447, 457, 467, 472, 482, 487, 492, 497, 502, 511, 525, 530, 539, 543, 553, 558, 564, 569, 574, 579, 584, 594, 599, 604, 609, 619, 625, 630, 634, 1043, 1048, 1053, 1145, 1319, 1323, 1327, 1331, 1338, 1342, 1353, 1358, 1362, 1378, 1383, 1388, 1512, 1520, 1535, 1540, 1544, 1645, 1650, 1655). Straight leg raises were positive. (Tr. 435, 440, 447, 457, 467, 472, 482, 487, 492, 497, 502, 511, 521, 525, 530, 539, 558, 564, 569, 574, 579, 584, 594, 599, 604, 619, 634, 1043, 1048, 1053, 1145, 1331, 1338, 1342, 1353, 1358, 1362, 1378, 1383, 1388, 1512, 1520, 1645, 1655). Ms. Lanning was otherwise stable, able to walk, and had an age-appropriate range of motion. (*See generally* Tr. 435, 440, 447, 457, 467, 472, 482, 487, 492, 497, 502, 511, 530, 558, 564, 569, 574, 604, 1043, 1048, 1053, 1331, 1338, 1342, 1353, 1358, 1362, 1378, 1383, 1388; *cf.* 521, 525, 539, 579, 584, 594, 599, 619, 634, 1145, 1512, 1520, 1645, 1655 (antalgic gait)).

On August 23, 2017, Ms. Lanning was referred for aquatic and physical therapy, but she declined to attend; at later visits she was encouraged to attend physical and aquatic therapy and do low velocity exercises at home. (Tr. 448, 458). Physical examinations showed paraspinal muscle spasm, pain with facet loading of the lumbar spine, trigger point activities, and decreased motion in the cervical spine. (Tr. 457, 462).

Ms. Lanning was initially treated with 10.2 mg of morphine via her pain pump, but was changed to 48 mcg of Dilaudid on June 28, 2017. (Tr. 470-73). By October 2017, after several prior dosage increases, Ms. Lanning's pump dose had reached 80 mcg/day, and she was switched from gabapentin and started on a two-week trial of Lyrica. (Tr. 436). Shortly before the removal of her pain pump, Ms. Lanning was receiving 121.3 mcg of Dilaudid daily. (Tr. 1359).

On July 20, 2017, Ms. Lanning presented to the Summa Health emergency department for a bad reaction to her opioid medication. (Tr. 735-77). She was somnolent, dizzy, and giddy. (Tr. 735). Her symptoms were assessed as a side effect of switching from morphine to Dilaudid. (Tr. 742-43). At her next clinic visit on July 25, 2017, Ms. Lanning stated she went to the emergency room believing she was overdosing. (Tr. 460). Her pain pump medication was not increased at this visit. (Tr. 460-64). Ms. Lanning reported she had quit her job around August 15, 2017, due to her chronic pain. (Tr. 438).

On October 18, 2017, an MRI showed multilevel facet arthropathy.[3] (Tr. 433). The physical examination again noted tenderness in the midline, bilateral paraspinal muscles, and bilateral sacroiliac joints. (Tr. 435). Straight leg raises were positive, but Ms. Lanning was otherwise

---

[3]     Multilevel facet arthropathy is arthritis in the facet joints of the spine.

stable, able to walk, and had an appropriate range of motion. (*Id.*). Lumbar facet blocks were ordered. (Tr. 436).

On May 2, 2018, Ms. Lanning underwent a roller dye study that determined her pain pump had dislodged from its anchor stitches and was shifting around on her abdomen. (Tr. 1349). Fluid was forming around the pump, making it difficult to refill the pump accurately. (*Id.*). These issues caused Ms. Lanning significant breakthrough pain and required surgery to re-anchor the pain pump. (Tr. 1349-50).

After receiving multiple options for treatment, Ms. Lanning requested removal of the pain pump, which was completed on June 13, 2018. (Tr. 1333-35). At a post-surgical follow-up appointment on June 22, 2018, Dr. Stokes removed two staples, but was unable to remove the remaining staples due to non-healing. (Tr. 1413-15). Ms. Lanning was hospitalized from June 23 through 27, 2018 for postoperative wound infection and abscesses on her lower back and abdomen. (Tr. 1425-84). Ms. Lanning initially presented on June 23rd as a 10/10 in pain, but was observed resting comfortably that evening with a pain scale of 0/10. (Tr. 1427, 1431). After Ms. Lanning's postoperative wound stopped draining fluid, the remaining staples were removed and replaced with locking sutures. (Tr. 1438). Ms. Lanning was then discharged on June 27, 2018. (Tr. 1438-40).

After Ms. Lanning's pain pump was removed, she managed her pain through oral medication. (*See, e.g.*, Tr. 1510, 1521, 1528, 1535, 1540, 1544, 1643, 1648, 1653). Ms. Lanning received two left lumbar injections on December 3, 2018, and had a 60% pain reduction. (Tr. 1510). Ms. Lanning also saw improvement with chiropractic visits. (Tr. 1643; *see also* Tr. 1491-96,

1595-1603, 1668-73). Ms. Lanning was again referred for aquatic and physical therapy that she once again declined. (Tr. 1656).

At her appointment on January 31, 2019, Ms. Lanning reported her pain symptoms had improved, and she was able to continue performing daily activities. (Tr. 1653). But on March 7, 2019, Ms. Lanning reported that her Xtampza ER medication was not helping her pain and she was not able to obtain relief. (Tr. 1648). Ms. Lanning's prescription for Xtampza ER was stopped due to side effects and she was started on Nucynta (tapentadol). (Tr. 1648-51). On April 11, 2019, Ms. Lanning reported her pain seemed better controlled with Percocet. (*Id.*). She stated she was tired of trying extended-release medications and her pain was not well controlled with her current prescriptions. (*Id.*). At this visit, Ms. Lanning's Nucynta prescription was stopped, and she was started on a 10 mg dose of oxycodone every eight hours. (Tr. 1646).

**COPD.** Ms. Lanning was diagnosed with COPD and prescribed antibiotics and two inhalers by Dr. Stokes on December 14, 2017. (Tr. 1179-81). On January 4, 2018, Dr. Stokes prescribed antibiotics and a steroid to treat her cough, shortness of breath, and weakness. (Tr. 1175-78). At this visit, Dr. Stokes referred Ms. Lanning to Masroor Mustafa, M.D., for ongoing treatment of her COPD. (Tr. 1177).

Ms. Lanning was treated regularly for her COPD by Dr. Mustafa. (Tr. 1301-15; 1548-65; Tr. 1616-42; *see also* Tr. 1177). In April 2018, Ms. Lanning presented with chest congestion, shortness of breath and cough, which worsened throughout the night and into the morning. (Tr. 1301). A CT scan demonstrated severe emphysematous changes throughout Ms. Lanning's lungs. (Tr. 1307). Ms. Lanning's lungs showed signs of hyperinflation, but no pleural effusions. (Tr. 1307-

08). Dr. Mustafa prescribed Symbicort, ProAir HFA, and Proventil to treat her COPD symptoms. (Tr. 1314-15).

On March 28, 2019, Ms. Lanning underwent pulmonary stress testing. (Tr. 1616-17). Results from a six-minute walk test demonstrated oxygen saturation (SpO2) levels of 98% at room air at rest, and 92% with activity. (*Id.*). These results indicated that Ms. Lanning may qualify for stationary oxygen. (Tr. 1618). Later visits indicate Ms. Lanning required supplemental oxygen at nighttime and still experienced worsening shortness of breath and decrease in oxygen saturation with exertion. (Tr. 9-14). Wheezing and rales were present, but there was no respiratory distress. (Tr. 13).

On May 30, 2019, Dr. Stokes completed a medical source assessment based on Ms. Lanning's COPD symptoms. (Tr. 1675-76). In his assessment, Dr. Stokes indicated Ms. Lanning was unable to do any heavy lifting (no more than ten pounds). (Tr. 1675). Ms. Lanning would need to be absent more than four days per month, off-task over 20% of an eight hour workday, and would need to lie down for an hour. (Tr. 1676). Ms. Lanning would require an additional four breaks per day due to her symptoms. (*Id.*). In Dr. Stokes' opinion, Ms. Lanning could tolerate noise and vibrations, but no other environmental restrictions such as humidity, temperature extremes, chemicals, dust, or humidity. (Tr. 1675). Dr. Stokes based his assessment on Ms. Lanning's lung disease. (Tr. 1676).

State agency reviewers Linda Hall, M.D., and Leslie Green, M.D., reviewed Ms. Lanning's medical record. (Tr. 116-22, 123-24). Dr. Hall reviewed Ms. Lanning's record on February 9, 2018, and limited Ms. Lanning to light work, but found that her symptoms of COPD, fibromyalgia, chronic pain, breast cancer, depression, arthritis, fatigue, weakness, and focus problems were not

11

disabling. (Tr. 122-24). Dr. Green reviewed Ms. Lanning's record on March 24, 2018, and found she could perform sedentary work despite her limitations due in part to COPD, fibromyalgia, back and leg pain, breast cancer in remission, and depression. (Tr. 150-56).

**Breast Cancer.** A diagnostic mammogram from May 19, 2016 was suspicious for bilateral malignancy. (Tr. 692-93). Lee Ann Sprance, M.D., diagnosed Ms. Lanning with ductal carcinoma in situ (DCIS) in her right breast. (Tr. 421-23). Ms. Lanning elected to have her left breast removed prophylactically, as well as the malignancy in the right breast. (*Id.*). The double mastectomy was performed on August 15, 2016. (*Id.*). At the same time, Ms. Lanning underwent bilateral implant reconstruction surgery, performed by John C. Pedersen, M.D.. (*Id.*). The surgery was successful; the DCIS was removed and no invasive component was found. (Tr. 425). Dr. Pedersen found redness in her right breast at the follow-up exam on August 23, 2016, but otherwise the implants appeared to be in good position and with no evidence of infection. (Tr. 1032). By September 27, 2016, however, the implants had become infected and required removal. (Tr. 396-98). The incisions healed well once the implants were removed. (Tr. 399-401).

Ms. Lanning showed no evidence of DCIS recurrence at her follow-up appointments, and her status remained stable. (*See, e.g.*, Tr. 1662). On June 26, 2016, Dr. Sprance indicated in response to a request for information on Ms. Lanning's initial claim that Ms. Lanning had no ongoing limitations from her double mastectomy. (Tr. 1165-67).

**Depression and Anxiety.** On February 14, 2018, Robert F. Dallara, Jr., Ph.D., conducted a psychological evaluation of Ms. Lanning. (Tr. 1293-99). Ms. Lanning reported she had previously seen a psychiatrist on one occasion in 2016, but had otherwise not pursued other mental health treatment. (Tr. 1294, 1297). Ms. Lanning reported crying spells and loss of interest, describing her

12

mood as depressed for the past five years. (Tr. 1295). During the examination, Dr. Dallara

described Ms. Lanning's affect as "appropriate but tearful at times." (*Id.*). Ms. Lanning did not

display overt signs of anxiety during the exam and denied any known triggers or excessive fears, but

did describe herself as "overwhelmed." (*Id.*). Ms. Lanning did express some memory impairment

and difficulty in cognitive functioning, but attributed these issues to her medication. (*Id.*).

Dr. Dallara estimated that Ms. Lanning is of low-average intelligence. (*Id.*). Dr. Dallara

determined the following diagnostic impressions: persistent depressive disorder, unspecified

anxiety disorder. (Tr. 1296). Dr. Dallara suggested the possibility of a cognitive disorder, but had

insufficient evidence to support a diagnosis. (Tr. 1296). In Dr. Dallara's estimation, Ms. Lanning

may have difficulties withstanding the stress and pressure of day-to-day work activity due to her

depression and anxiety. (Tr. 1297). In Dr. Dallara's opinion, Ms. Lanning otherwise would be able

to work without issue and could understand and apply instructions in a work setting. (*Id.*).

Ms. Lanning's record underwent state agency review by Vicki Warren, Ph.D. and Bonnie

Katz, Ph.D. (Tr. 121-22, 136-37). They found her no more than "moderately limited" due to her

symptoms of depression and anxiety. (*Id.*). Their recommendation was that Ms. Lanning would be

able to work in a static setting with occasional interactions with others. (*Id.*).

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security
      Act (the "Act") through December 31, 2022.

2.    The claimant engaged in substantial gainful activity during the following
      periods: April 1, 2017 through June 30, 2017 (20 CFR 404.1520(b),
      404.1571 *et seq.*, 416.920(b) and 416 971 *et seq.*).

3.    However, there has been a continuous 12-month period(s) during which the
      claimant did not engage in substantial gainful activity. The remaining

findings address the period(s) the claimant did not engage in substantial gainful activity.

4.    The claimant has the following severe impairments: lumbar spondylosis/degenerative disc disease/sacroiliitis, status-post laminectomy [hereinafter, collectively, the "spine disorder"], mitral valve disorder, chronic obstructive pulmonary disease, history of breast cancer, status-post double mastectomy, persistence depressive disorder and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

5.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.5126, 416.920(d), 416.925 and 416 926).

6.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant must be afforded the opportunity to alternate between the seated and standing postures once each thirty minutes; the claimant must avoid all exposure to workplace hazards, including unprotected heights, hazardous machinery and commercial driving; the claimant must avoid concentrated exposure to pulmonary irritants including humidity, extremes of temperature, dust, odors, gases, fumes and poor ventilation; the claimant is limited to the performance of simple, routine tasks and the making of no more than simple, work-related decisions, undertaken in a work setting that requires no more than frequent contact with supervisors, co-workers and the public, which setting is routine, in that it contemplates few changes in workplace tasks or duties.

7.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.    The claimant was born on March 31, 1975 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1523 and 416.963).

9.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 716.964).

10.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR part 404, Subpart P, Appendix 2).

11.    Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12.    The claimant has not been under a disability, as defined in the Social Security Act, from March 10, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 32-43).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a) and 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is

disabled:

1.   Was claimant engaged in a substantial gainful activity?

2.   Did claimant have a medically determinable impairment, or a combination
     of impairments, that is "severe," which is defined as one which substantially
     limits an individual's ability to perform basic work activities?

3.   Does the severe impairment meet one of the listed impairments?

4.   What is claimant's residual functional capacity and can claimant perform
     past relevant work?

5.   Can claimant do any other work considering her residual functional
     capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant bears the burden of proof in Steps

One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five

to establish whether the claimant has the residual functional capacity to perform available work in

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only those claimants satisfying each element of the analysis, including inability to do other work,

and meeting the duration requirements will be determined to be disabled. 20 C.F.R.

§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Lanning offers three arguments supporting remand: first, the ALJ erred in discrediting

all of the medical opinions in the record; second, the ALJ erred in discrediting Ms. Lanning; and

third, the ALJ erred in failing to define properly the sit-stand option in the RFC as required by

SSR 96-9p. (Pl.'s Br., ECF #15, PageID 1763-72). The Commissioner opposes each argument.

(Def.'s Br., ECF #18, PageID 1787-98). I address each in turn.

## I.     The ALJ appropriately considered the medical opinions of record.

Ms. Lanning argues the ALJ erred in discrediting all the medical opinions in the record,

particularly Dr. Stokes' opinion, and improperly "play[ed] doctor" with the evidence. (Pl.'s Br.,

ECF #15, PageID 1762-64). The Commissioner counters that the ALJ adequately articulated the

persuasiveness of the medical opinions in the record. (Def.'s Br., ECF #18, PageID 1787-88). The

Commissioner further asserts the ALJ discounted the opinions in the record to create an RFC that

better accommodates Ms. Lanning's needs. (*Id.* at PageID 1788-93). I agree with the Commissioner

that the RFC crafted by the ALJ is appropriate to Ms. Lanning's needs.

For claims filed on or after March 27, 2017, the ALJ is to articulate "how persuasive [he]

find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case

record." 20 C.F.R. § 404.1520c(b). The ALJ is not required to defer to or give any specific

evidentiary weight to a medical opinion, and is not required to give a treating source controlling

weight. 20 C.F R. § 404.1520c(a). Instead, the ALJ must articulate the consideration given to the

medical opinions in the record, grounded in the two "most important factors"—supportability and

consistency. 20 C.F.R. § 404.1520c(b).

The ALJ is responsible to form an RFC appropriate to the claimant's abilities, supported by

the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th

Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work, once

the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in

the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the

nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* The ALJ is not required to implement all suggested limitations and may impose more restrictions than are set forth in a medical opinion. Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015).

Here, there is no indication the ALJ failed to provide adequate reasoning for his decision. The ALJ provided a comprehensive decision, thoroughly articulating the reasons for discounting each medical opinion in the record. (Tr. 30-44). Moreover, Ms. Lanning was not prejudiced by the ALJ's treatment of the medical opinions in the record. Not all of the medical opinions were favorable; for example, Dr. Sprance indicated Ms. Lanning had no surgical limitations (Tr. 1167), Dr. Dallara stated Ms. Lanning could "understand and apply instructions in a work setting consistent with low-average intellectual activities" but with "some difficulties" when interacting with coworkers (Tr. 1297), and state agency physicians found Ms. Lanning would be limited to light work and four hours standing/walking. (Tr. 118-21, 150-52). Discounting these opinions, the ALJ created the following RFC:

> the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant must be afforded the opportunity to alternate between the seated and standing postures once each thirty minutes; the claimant may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid all exposure to workplace hazards, including unprotected heights, hazardous machinery and commercial driving;

> the claimant must avoid concentrated exposure to pulmonary
> irritants, including humidity, extremes of temperature, dust, odors,
> gases, fumes and poor ventilation; the claimant is limited to the
> performance of simple, routine tasks and the making of no more than
> simple, work-related decisions, undertaken in a work setting that
> requires no more than frequent contact with supervisors, co-workers
> and the public, which setting is routine, in that it contemplates few
> changes in workplace tasks or duties.

(Tr. 35-36).

After comparing the state agency medical consultants' opinions against the other evidence
in the record, the ALJ concluded their opinions were only "partially persuasive," as "restriction to
'true' sedentary work appears appropriate on the overall record[.]" (Tr. 40). The ALJ included
limitations as to Ms. Lanning's exposure to pulmonary irritants, as provided in Dr. Stokes'
opinion, but declined to include his other limitations as inconsistent with the record—such as his
limitation of the use of her hands. (Tr. 40-41). His opinion was deemed unpersuasive in part due
to the inconsistency between the overall medical evidence and any purported need for
manipulative limitations due to COPD. (*Id*).

Dr. Sprance indicated Ms. Lanning had no limitations relevant to her breast cancer history;
the ALJ deemed Dr. Sprance's opinion unpersuasive because Ms. Lanning did indeed require
limitations—but not due to her history of breast cancer. (Tr. 41). The ALJ included some
limitations based on the opinions of the state agency psychological consultants, but ultimately
found them unpersuasive due to Ms. Lanning's own denial of such difficulties. (*Id*.). The ALJ
found Dr. Dallara's opinion unpersuasive due to its vague descriptions of Ms. Lanning's
impairments of work function but still included limitations to simple, routine tasks and decision-
making and frequent contact with coworkers or supervisors. (Tr. 35; 41-42). Although Ms.
Lanning argues the ALJ's decision was based on evidence "cherry-picked" from the record, she may

not like the result if this decision were overturned and the unfavorable opinions given more weight by the Commissioner's next review. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 285 (6th Cir. 2009).

The ALJ's statement that all medical opinions in the record were, at best, only partially persuasive, is belied by the fact that the ALJ considered the substance of the medical opinions and incorporated what he deemed appropriate into his RFC determination. (*See* Tr. 35-42). The ALJ's decision presents a clearly articulated review of the record as a whole. (*See id.*). It provides an RFC consistent with Ms. Lanning's needs, and is well-articulated and supported by the record as a whole. I find no basis to overturn the Commissioner's decision based on Ms. Lanning's first argument.

## II. The ALJ appropriately considered Ms. Lanning's testimony.

Ms. Lanning next argues the ALJ did not adequately consider her subjective testimony regarding her symptoms of pain and found her not credible. (Pl.'s Br., ECF #15, PageID 1767-71). The Commissioner responds that the ALJ considered Ms. Lanning's subjective complaints but ultimately found them "not entirely consistent" with the evidence. (Def.'s Br., ECF #18, PageID 1793-98). I agree with the Commissioner—the ALJ did consider Ms. Lanning's subjective complaints but only incorporated those complaints deemed consistent with the record as a whole.

An ALJ follows a two-step process for evaluating an individual's symptoms. In step one, the Commissioner determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. In step two, the Commissioner evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the

second stage, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources. *Id.*

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ deems it inconsistent with objective medical and other evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003). The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," as long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints and the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

I find no compelling reason to disturb the ALJ's analysis of Ms. Lanning's subjective complaints. Ms. Lanning's assertion that the ALJ believed her "not credible" is unfounded. The ALJ observed Ms. Lanning's need to stand and move around the courtroom during the hearing. (Tr. 71). He acknowledged this need by incorporating a sit-stand option in the RFC. (Tr. 35). The

ALJ also noted Ms. Lanning's back pain issues expressed at the hearing and present throughout the record; in response, he provided a sedentary RFC beyond that articulated by agency reviewers or her oncologist. (*Id.*). In the record, Ms. Lanning reported being able to attend to her daily needs and work part-time—notably, her part-time work was in food service and not in sedentary roles; the ALJ found this evidence to be "not entirely consistent" with her subjective complaints. (Tr. 39). As a result, the ALJ incorporated some, but not all, of her subjective complaints into the RFC. (*See* Tr. 35).

I decline to recommend remand on this basis.

### III.    The ALJ sufficiently defined the sit-stand option in the RFC as required by SSR 96-9p.

The ALJ defined the sit-stand option in Ms. Lanning's RFC as follows: the claimant "must be afforded the opportunity to alternate between the seated and standing postures once each thirty minutes." (Tr. 35). Ms. Lanning contends that in so doing, the ALJ created a "faulty RFC determination" and thereby failed to meet his Step Five burden. (Pl.'s Br., ECF #15, PageID 1771). For the reasons that follow, I disagree.

In the five-step sequential analysis, the claimant has the burden of proof in Steps One through Four, but at Step Five, the burden shifts to the Commissioner to establish whether the claimant has the RFC to perform work available in the national economy. *Walters*, 127 F.3d at 529. At Step Five, the ALJ must make a finding, supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002). The ALJ is responsible for evaluating the medical evidence and the claimant's testimony to form an appropriate assessment of the claimant's RFC. *Webb*, 368 F.3d at 633. An ALJ may also rely on a VE's testimony in assessing the claimant's RFC, as long as it

accounts for the claimant's limitations. *Id.* at 632 (quoting *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d. 777, 780 (6th Cir. 1987)).

When assessing a claimant's need to alternate sitting and standing, SSR 96-9p provides as follows:

> **Alternate sitting and standing:** An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.

Here, Ms. Lanning testified during the hearing about her need to sit, stand, and move about to manage her pain. (Tr. 71). The ALJ then presented a hypothetical to the VE that included a limitation requiring "the ability to alternate between sitting and standing every 30 minutes[.]" (Tr. 90). The VE responded that the sedentary jobs listed—Weight Tester, Order Clerk, and Addresser—could all be performed with a sit-stand option. (*Id.*). The ALJ included this limitation in his RFC, stating: "the claimant must be afforded the opportunity to alternate between the seated and standing postures once each thirty minutes[.]" (Tr. 35).

Ms. Lanning contends the phrase "afforded the opportunity" is not sufficiently specific enough to define the sit-stand option. (Pl.'s Br., ECF #15, PageID 1771). I disagree. The ALJ formed an RFC based on Ms. Lanning's need to move about to manage her pain, presented an appropriate hypothetical to the VE, and included this limitation in the RFC. Including the "afforded the opportunity" language so that Ms. Lanning may elect the position that best suits her pain management needs every 30 minutes does not present a reversible defect in the RFC.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying DIB and SSI supported by substantial evidence and recommend the decision be **AFFIRMED**.

Dated: October 15, 2021

_____

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).